BAGLIN v. TITLE GUARANTY & SURETY CO.

(Circuit Court, E. D. Pennsylvania. January 19, 1909.)

No. 144.

1. COURTS (§ 322*) — FEDERAL COURTS — DIVERSE CITIZENSHIP — PLEADING — AMENDMENT.
    An objection that plaintiff in a suit in the federal courts was only a nominal party, and that it did not appear that the real party in interest possessed the requisite citizenship to give the court jurisdiction, was a defect which might be remedied by amendment after a trial on the merits by amending the record so as to make it recite that the suit was by plaintiff to the use of the real party in interest, and by inserting proper averments concerning his citizenship.
    [Ed. Note.—For other cases, see Courts, Cent. Dig. § 887; Dec. Dig. § 322.*]

2. PRINCIPAL AND SURETY (§ 159*) — REMEDIES OF CREDITORS — BURDEN OF PROOF.
    In an action on a corporation surety bond, the burden of proof was on the corporation to sustain a defense of ultra vires.
    [Ed. Note.—For other cases, see Principal and Surety, Dec. Dig. § 159.*]

3. PRINCIPAL AND SURETY (§ 66*)—BONDS—CONSTRUCTION.
    Where a surety bond guaranteed that the principal should return to plaintiff on a specified day certain securities loaned, and contained nothing by which the principal bound himself to discharge his obligation by paying cash, the bond was not security for the payment of money but for the return of the securities, notwithstanding the principal, under other agreements, was entitled at his option to satisfy the obligation secured by a payment of the market value of the bonds on the date specified.
    [Ed. Note.—For other cases, see Principal and Surety, Dec. Dig. § 66.*]

4. BAILMENT (§ 23*)—LOAN OF BONDS—OBLIGATION TO RETURN—PERFORMANCE.
    The obligation of a borrower of past-due United States bonds, to be returned on a specified day, could be discharged either by returning similar bonds or by paying the face value of those borrowed with interest.
    [Ed. Note.—For other cases, see Bailment, Cent. Dig. § 111; Dec. Dig. § 23.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. PRINCIPAL AND SURETY (§ 42*)—DISCHARGE OF SURETY—CONCEALMENT.

Where a surety company executed a bond guaranteeing a borrower's return of certain bonds at a specified date, the fact that by a separate agreement the borrower was given the option to pay cash instead of returning the bonds was not a material fact, the concealment of which from the surety released it from liability.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 86–90; Dec. Dig. § 42.*]

6. PRINCIPAL AND SURETY (§ 90*)—OBLIGATION OF SURETY—DISCHARGE.

H. and L. executed a joint note to a trust company for $200,000, which the trust company discounted after receiving collateral from H., it having been agreed between H. and L. that L. should receive $75,000 of the money on delivery to H.'s secretary of a surety bond for repayment on a specified date. L. being unable to procure such a bond, the agreement was modified so that H.'s secretary invested the $75,000 in United States bonds, which he loaned to L. on L.'s procuring a surety bond for the return thereof on a specified date. *Held,* that the trust company having refused to renew the loan without further collateral, and L. being unable to furnish the same or to return the bonds on the date specified in the bond, the surety was not discharged by the fact that H., on depositing additional security thereafter, obtained an extension of the loan on his own account.

[Ed. Note.—For other cases, see Principal and Surety, Dec. Dig. § 90.*]

Motion by Defendant for Judgment Notwithstanding the Verdict.

Kellogg, Beckwith & Emery and Morgan, Lewis & Bockins, for plaintiff.

John W. Graham, Jr., and Alex. Simpson, Jr., for defendant.

J. B. McPHERSON, District Judge. At the close of the trial of this case, it was agreed by the parties that no questions called for submission to the jury. This agreement was equivalent to a request that the facts should be found by the court (Beuttell v. Magone, 157 U. S. 154, 15 Sup. Ct. 566, 39 L. Ed. 654), and, accordingly, what amounted to a provisional finding was made by directing a verdict for the plaintiff, while control over the whole subject was retained by following the excellent Pennsylvania practice and taking the verdict subject to the reserved question of law, whether there was any evidence to go to the jury in support of the plaintiff's claim. A detailed finding of the facts is now made as follows:

On June 19, 1907, the plaintiff and Garrett B. Linderman executed an agreement in this language:

"(1) Mr. Linderman requests Mr. Baglin to cause to be deposited with the Metropolitan Trust Co. of New York, 6,700 shares of United Copper common stock as collateral for the joint note of the parties hereto of $200,000, about to be discounted with said trust company, payable September 26, 1907.

"(2) Mr. Linderman also requests Mr. Baglin to procure for him out of the proceeds of this loan $75,000 and Mr. Linderman agrees to repay the said sum to Mr. Baglin on September 26, 1907, with interest at 6%.

"(3) In further consideration of the foregoing, Mr. Linderman agrees that he will, on or before June 27, furnish to Mr. Baglin a bond in form satisfactory to Mr. Baglin, executed by the People's Surety Co., guaranteeing the repayment to Mr. Baglin of the said $75,000, with interest, at the said date, and of any part thereof which Mr. Linderman may receive.

"(4) In consideration of the foregoing, Mr. Baglin agrees that he will forthwith loan to Mr. Linderman out of the proceeds of the loan from the trust

company, when made, the sum of $15,000 upon Mr. Linderman's one day note, and that he will, as soon as the foregoing bond is furnished, loan him the additional sum of $60,000. Upon giving said bond the one day note shall be cancelled and the entire $75,000 shall be repayable to Mr. Baglin on September 26, 1907, with interest at 6%."

The plaintiff was the private secretary of F. A. Heinze, and in making this agreement, and in all the transactions that followed, he was acting solely as Heinze's agent. He had no pecuniary interest therein, although he acquired legal rights thereby and assumed legal obligations. The agreement of June 19th was the result of negotiations between Linderman and Heinze, the object of which was that both should share in the proceeds of a loan from the Metropolitan Trust Company of New York City. Linderman had made preliminary arrangements with the trust company for this loan, for which Heinze was to furnish 6,700 shares of common stock in the United Copper Company as collateral security; and the money was to be divided between them, Linderman receiving $75,000, and Heinze $125,000. But, as the note to the trust company was to be the joint obligation of Baglin and Linderman, it was provided that Linderman should protect Baglin by furnishing security that he would meet his share of the note when it fell due. He agreed, therefore, that he would furnish a bond of the People's Surety Company, guaranteeing the payment of $75,000 at the proper date. This he was unable to do, because the surety company declined to give a bond in that form, apparently holding the opinion that it could not lawfully become surety for the repayment of money. Meanwhile the contemplated note of $200,000 had been signed by Baglin and Linderman, the copper stock had been deposited with the trust company as collateral security, the money had been paid over to Baglin, and he had advanced to Linderman the $15,000 referred to in article 4 of the agreement. Heinze received his share of the loan, but at what time does not appear and is not important.

To overcome the real or supposed difficulty about obtaining the bond of a surety company guaranteeing the repayment of money, the agreement of June 19th was modified on July 17th as follows:

"Whereas George Baglin and Garrett B. Linderman, both of the city of New York, entered into a certain agreement in writing dated on or about the 19th day of June, 1907, and

"Whereas the acts referred to in paragraph 1 of the aforementioned agreement have already been performed, and the loan of $15,000 referred to in paragraph 4 thereof has been made, and the one day note therein referred to has been given; and

"Whereas said parties now desire to modify and supplement the same as to the acts still to be done thereunder in certain respects,

"Now therefore, in consideration of one dollar by each to the other in hand paid, and the mutual promises and covenants herein, it is agreed between said parties as follows:

"(1) That paragraph 2 of the aforementioned agreement be modified so that Mr. Baglin, instead of loaning $75,000 cash to Mr. Linderman, shall invest said sum in United States government bonds known as 'Old 4's' redeemable on and after July 1, 1907, by purchasing with said sum 75 of such bonds of the par value of $1,000 each, upon being supplied in cash by Mr. Linderman with the excess over $75,000 necessary for the purchase of said bonds and the payment of commission upon such purchase.

"(2) Said paragraph 2 of the aforementioned agreement is hereby further supplemented by providing that Mr. Baglin shall forthwith loan to Mr. Linder-

man said $75,000 worth of bonds upon the repayment, as provided in paragraph 4 hereof, of the $15,000 previously advanced by Mr. Baglin to Mr. Linderman; and Mr. Linderman hereby agrees on September 26, 1907, to return to Mr. Baglin said United States government bonds, or others of the description and par value above referred to.

"(3) Paragraph 3 of the former agreement above referred to is hereby modified so that Mr. Linderman shall furnish contemporaneously herewith a bond or bonds in form satisfactory to Mr. Baglin, and executed by a surety company or surety companies satisfactory to him, conditioned for the return on September 26, 1907, of the United States government bonds of the description and par value above referred to.

"(4) It is hereby mutually agreed that contemporaneously with the execution hereof Mr. Linderman shall return to Mr. Baglin the $15,000 heretofore loaned to Mr. Linderman by Mr. Baglin pursuant to paragraph 4 of the aforementioned agreement, with interest to date, whereupon Mr. Baglin will cancel and surrender to Mr. Linderman the latter's promissory note referred to in said paragraph.

"(5) It is hereby mutually agreed that in case a renewal or extension of the loan of $200,000 from the Metropolitan Trust Co., referred to in paragraph 1 of the aforementioned agreement, shall be obtained, then the obligation of Mr. Linderman hereunder to return said bonds, as heretofore set forth, shall be likewise extended for the same period, provided however, and only upon the express condition, that Mr. Linderman shall furnish to Mr. Baglin the consent of the surety company or surety companies executing undertakings for the return of said government bonds, as heretofore provided, in writing in a form satisfactory to Mr. Baglin, to the extension of Mr. Linderman's time to return the said bonds, and shall agree in such written consent that such extension shall in no wise impair, limit or affect the liability of such company or companies upon such undertakings.

"Witness the hands and seals of the parties hereto this 17th day of July, 1907.                                    Geo. Baglin.
                                             "Garrett B. Linderman."

On or before July 17th the Southern Surety Company had given such an obligation as was contemplated by this agreement, guaranteeing the return of $45,000 of the bonds, leaving $30,000 still unprovided for. This appears from a paper that was also signed on July 17th:

"The receipt by Mr. Garrett B. Linderman from Mr. George Baglin of $45,000 par value of United States government bonds, known as Old Fours, pursuant to the agreement between the above mentioned parties of June 19, 1907, as supplemented and modified by the further agreement between the same parties dated July 17, 1907, is hereby acknowledged, and the receipt by Mr. Baglin from Mr. Linderman of an undertaking of the Southern Surety Co. for the return of said bonds, pursuant to the aforementioned agreements, is likewise acknowledged.

"Mr. Baglin agrees that the remaining $30,000 par value of bonds of the said description, which he has agreed to loan pursuant to the aforementioned agreements, will be procured and loaned by him to Mr. Linderman when Mr. Linderman provides a further undertaking from a satisfactory surety company for the return of said additional $30,000 of said bonds as provided in the agreement aforementioned.

"Mr. Baglin also represents hereby to Mr. Linderman that it is his desire and intention at the time when said bonds would be returnable pursuant to the aforementioned agreements to accept from Mr. Linderman the face value of said bonds in cash with interest at 6% in lieu of the return of the bonds themselves.                                    Garrett B. Linderman.
"Dated July 17th, 1907.                        George Baglin."

On July 23d Linderman applied to the defendant company (the People's Trust Company disappearing from the transaction) for a bond of $30,000 to be given to Baglin, and stated the character of the guaranty required in the following language:

"Garrett B. Linderman, who owns United Copper stock, has deposited same under a general pooling agreement, and being desirous of using $30,000 of said stock for purposes of collateral, the said George Baglin has agreed to loan to the said Garrett B. Linderman, U. S. government bonds (known as Old 4's) at the par value of $30,000, and the said Linderman has agreed to return the said bonds to the said Baglin on or before September 25, 1907."

He appended to this application a statement of his personal resources, showing an excess of assets of $1,757,000, and deposited with the defendant certain bonds and stock that were accepted as satisfactory counter indemnity. He paid a premium of $300, and the bond in suit was thereupon issued under date of July 23d. It reads as follows:

"Know all men by these presents, that we, Garrett B. Linderman, of South Bethlehem, Pennsylvania, as principal, and The Title Guaranty & Surety Company, a corporation organized under the laws of the state of Pennsylvania, as surety, are held and firmly bound unto George Baglin in the sum of thirty thousand dollars to be paid to the said George Baglin, his heirs and assigns, for which payment, well and truly to be made we do bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally by these presents.

"Signed and sealed this 23rd day of July, A. D. 1907.

"Whereas, the said George Baglin has loaned, or is about to loan to Garrett B. Linderman, United States government bonds known as 'Old 4's' of the par value of thirty thousand dollars, redeemable on or after July 1, 1907, a true and correct list whereof is hereto attached marked 'Exhibit A' and made part hereof; and

"Whereas the said Garrett B. Linderman has promised and agreed to return to the said George Baglin the aforementioned securities, on or before the 25th day of September, 1907:

"Now the condition of this obligation is such, that if the said Garrett B. Linderman, his heirs, executors, administrators, successors or assigns, shall and do return to the said George Baglin, his executors, administrators and assigns, the above mentioned securities, on or before the 25th day of September, 1907, then this obligation shall be void; otherwise to remain in full force and virtue.                                          Garrett B. Linderman.      [Seal.]

                                          "The Title Guaranty & Surety Co.,
                                          "By J. W. Graham, Jr.,
"Attest:   Frank R. Parker,                        Resident Vice President.
       "Resident Secretary.   [Seal of Co.]"

Shortly afterwards, the bond was delivered to Baglin in New York City. At the same time he delivered to Linderman United States 4's of the par value of $30,000, and these were sold by Linderman and their proceeds used for his own purposes. At the proper date in September their return was duly demanded by Baglin, but Linderman was unable to comply, as appears by his written acknowledgment, signed on September 26th:

"(1) Mr. Garrett B. Linderman hereby admits to Mr. George Baglin his inability to comply at this time with the demand now made upon him for the return to Mr. Baglin of $75,000 par value of U. S. government bonds known as 'Old 4's.'

"(2) Mr. Linderman likewise admits that, in view of the fact that the Metropolitan Trust Co. will not continue the loan referred to in the agreements, dated June 19, 1907, and July 17, 1907, between him and Mr. Baglin, except upon a deposit of further collateral and an additional endorsement, such continuation of that loan upon such terms is not a renewal or extension of the original loan such as was contemplated by him and Mr. Baglin in paragraph

5 of the agreement of July 17, 1907, and does not entitle him to an extension of his time to return said government bonds as provided in the paragraph in question.                                                    Garrett B. Linderman."

As appears from this paper, the Metropolitan Trust Company would not continue the loan upon the same terms as were granted on June 17th, and the result was that two new notes, aggregating $200,000, were given to that company by Linderman and Heinze jointly, the latter depositing 3,300 additional shares of copper stock as further security. The note given on June 17th by Linderman and Baglin was thereupon surrendered and marked "Paid," and Baglin's connection with the transaction came to an end, except so far as his relation to the present suit is concerned.

The defendant denies all liability upon several grounds. First, it is urged that Baglin is only a nominal party, the real interest residing in Heinze, and that it nowhere appears, either on the record or in the notes of testimony, that Heinze possesses the requisite citizenship to give jurisdiction to the Circuit Court. Without stopping to discuss this point, and merely for present purposes assuming it to be well taken, it is a defect that may be remedied by amendment after a trial on the merits, and permission is hereby given to amend the record within 10 days by marking the suit and the various papers in the cause "to the use of F. A. Heinze," and by inserting the proper averments concerning his citizenship.

The principal defense is the illegality of the bond, and this rests upon the position that the real transaction was not a loan of United States 4's, but a loan of money, and that the defendant had no power to guarantee the repayment of money. This asserted lack of corporate power was assumed rather than established. The charter of the company (whether it be special or under a general statute) was not offered in evidence, neither was my attention called to any Pennsylvania act or decision that forbids the defendant to guarantee such repayment. The burden of proof was certainly upon the surety company to show that such an undertaking would have been ultra vires. But I need not dwell upon this objection to the defense of illegality now under consideration, since the bond in suit guarantees, not the repayment of money, but the return of certain securities, and the legality of such an undertaking is not questioned. It is undoubtedly true that Baglin, Heinze, and Linderman all contemplated that Linderman would fulfill his agreement by paying money on September 26th, and that he was not expected to return either the same, or similar, bonds on that day. But it is also true that Linderman did not bind himself to discharge his obligation to Baglin by paying cash. He had an unquestionable right to discharge it by returning, or offering to return, United States bonds of the specified issue, and indeed this was the precise act he was legally obliged to perform. Baglin had declared his "desire and intention" to accept "the face value of said bonds in cash with interest at 6%, in lieu of the return of the bonds themselves"; but this simply gave Linderman an option to pay in cash if he elected so to do; it did not change the legal obligation into which he had entered, and this was to return United States bonds of the description and par

value referred to in his agreement. What he chose to do with the bonds that he received from Baglin was his own affair. He was not bound to keep them in his possession until September 26th, in order that he might hand them back on that date; presumably he intended to use them meanwhile for his own purposes, as he had a right to do; what he was chiefly concerned with was the fulfillment of his agreement to return them. This agreement he could discharge in one of two ways, either by a delivery of similar bonds (for I need not spend time to establish the proposition that he could not be compelled to return the identical bonds), or by paying the face value of the bonds in cash, with interest. The defendant company guaranteed that he would do the first of these two acts, namely, that he would return the same, or similar, bonds at the proper time, and, so far as appears, this was a lawful undertaking. The fact that Linderman had the privilege of fulfilling his agreement by paying cash instead of by returning the securities did no harm to the defendant, but was obviously to its advantage, for both these methods of discharging its own obligation were thus in effect placed at its own disposal. It can scarcely be doubted, I think, that on September 26th Linderman or the defendant company could have offered to Baglin either United States 4's of the specified description and par value, or their par value in cash with interest, and that a tender of either bonds or cash would have completely fulfilled not only Linderman's obligation, but also the obligation of the defendant. But, without regard to the alternative methods by which the guaranty could be made good, the fact remains that the guaranty in question was given and paid for, that it warranted the performance of a lawful act, and that such act has not been performed. By the plain language of the contract, therefore, the defendant's liability has attached, unless sufficient reason to the contrary can be shown. In my opinion, the reason just considered, namely, that the transaction was really a loan of money, and that the bond in suit was asked for in order to secure its repayment, is not sufficient.

But it is further argued that, when the bond in suit was executed and delivered to Baglin, the defendant knew nothing about the three agreements of June 19th and June 17th—this lack of knowledge is conceded to be true—and that good faith required Baglin to disclose the contents of these agreements before accepting the bond. So far as this argument is concerned, it does not matter much, I think, whether the defendant is to be treated as if it were a volunteer surety, or as if it were an insurer. In either character it was justified in expecting to be dealt with in good faith, and was entitled to rely upon the legal rules that govern the doctrine of concealment. Of course, Baglin cannot be held liable for anything that was said, or omitted to be said, by Linderman in the latter's negotiation with the defendant company; he can only be brought to account for his own conduct, and this amounted to no more than a failure to disclose Linderman's option to fulfill his obligation by payment in cash. There is some testimony concerning the presence of one of the defendant's representatives when the bond was delivered to Baglin, but there is no evidence whatever that any false or misleading representations were made at that interview. Indeed, it

appears that Baglin refused to accept the bond at that time without alteration, because it recited that he was the owner of the bonds, and by this refusal he plainly declared that some other person than himself was really interested in the transaction. Nothing more can be inferred from the testimony than the mere fact that he did not disclose the privilege of paying in cash that had been given to Linderman on July 17th. But, in order that such failure to speak should be obnoxious to the rules concerning concealment, it must appear that the existence of this option was a material fact, one that might fairly be considered as likely to influence the defendant in deciding whether it would accept the risk; and, for reasons already referred to, I do not think that the fact was of this character. It certainly did not make the risk greater, but made it less, for it provided an alternative method of meeting the obligation assumed by the bond, and was to that extent an advantage to the surety. Moreover, the defendant company had this option of paying in cash, even if there had been no agreement between Baglin and Linderman about it; for the breach of a contract to deliver securities having a market value is always (save perhaps under exceptional circumstances) made good by paying such value in money; and it is therefore difficult to see how it could be material to inform the defendant of what it must have known already, namely, that this particular guaranty, both by the ordinary rule of law and also by the special agreement between the parties, could be fulfilled by paying cash as well as by delivering bonds.

Finally, it is urged that the defendant is discharged because new notes were given to the Metropolitan Trust Company extending the time of paying the note of $200,000, and because this extension was granted without obtaining the defendant's assent thereto. Whatever force might be allowed to this contention, if the defendant had guaranteed the payment of the note—a point that does not need consideration now—I think no weight should be given to it, if I am right in the construction I have put upon the defendant's obligation. By that instrument, no contract was entered into with the trust company, and no contract was entered into with any one guaranteeing the payment of the note, or of any part of it. The guaranty was that bonds should be delivered at a fixed date, and this guaranty became an enforceable obligation when Linderman failed to deliver the securities in question. What was done with the note afterwards by the trust company does not seem to be relevant. Of course, if the note had been paid, the defendant's obligation would, in equity at least, have ceased to exist; but, since payment was not made, I am unable to see that the mere extension of time effected by taking new notes with a new maker and with additional collateral could affect the defendant's legal obligation, which had already become fixed by Linderman's default. If the bond in suit is binding at all, it binds according to its terms, and these call for the delivery of specified securities on a given date. Failure thus to deliver made the guaranty effective, and, for my part, I do not see how the defendant can properly escape liability.

Nor is there any reason to be astute in looking about for flaws that may invalidate the transaction. The defendant is not entitled to the

tender consideration that is accorded to an individual surety who is a mere volunteer. Surety companies are not to be so described; they are insurers, paid for their services, bound by contracts which are usually carefully drawn by themselves, and, as a general rule, satisfactorily secured by counter indemnity. They perform a most useful, and indeed, according to modern custom, an indispensable, function in the business and legal world, but they differ so much from an individual surety of the ordinary type as to render inapplicable some of the reasons that have led the courts to guard the rights of the individual surety with jealous care. Just how far the rules that apply to volunteer sureties should be modified when their protection is sought by a surety company, is not yet settled; but that some modification is necessary, plainly appears from several decisions. For example, in Guaranty Co. v. Pressed Brick Co., 191 U. S. 416, 24 Sup. Ct. 142, 48 L. Ed. 242, it was held that:

"The taking by a materialman of 30 and 60 day notes for materials supplied to one contracting with the government, and who had given the bond of a surety company in pursuance of the act of August 13, 1894, c. 280, 28 Stat. 278 (U. S. Comp. St. 1901, p. 2523), to the effect, among other things, that he would 'promptly make payment to all persons supplying him labor or materials,' will not necessarily relieve the surety company from obligation under the ordinary rule that exonerates a guarantor in case the time fixed for the performance of the contract by the principal be extended without his consent, where it does not appear that such extension was unreasonable, or that the surety was prejudiced thereby."

In deciding the case the Supreme Court recognized the difficulty of laying down any general rule, but evidently took note of the comparatively new subject presented for consideration, and the need for modifying the old rules as occasion might arise:

"The rule of strictissimi juris is a stringent one, and is liable at times to work a practical injustice. It is one which ought not to be extended to contracts not within the reason of the rule, particularly when the bond is underwritten by a corporation which has undertaken for profit to insure the obligee against a failure of performance on the part of the principal obligor."

And the Court of Appeals for the Fourth Circuit, in Atlantic Trust Co. v. Laurinburg, 163 Fed. 695, used the following language:

"Fully recognizing the rule of strictissimi juris as applying to contracts growing out of the ordinary relation of creditor and simple surety, we cannot and do not recognize this rule as applying to contracts underwritten by these bonding corporations, whose business it is (and a profitable one, too, it would seem, from the number organized and existing) to insure, for a monetary consideration, the obligee against a failure of performance on the part of the principal obligor. In such cases, before such bonding company can be released, it must show that the changes made in a contract like this, guaranteed by it, operated injuriously to affect its rights and liabilities. * * * The very reason for the existence of this kind of corporations, and the strongest argument put forward by them for patronage, is that the embarrassment and hardship growing out of individual suretyship that give application for this rule is by them taken away; that it is their business to take risks and expect losses. If, with their superior means and facilities, they are to be permitted to take the risks, but avoid the losses by the rule of strictissimi juris, we may expect the courts to be constantly engaged in hearing their technical objections to contracts prepared by themselves. It is right, therefore, to say to them that they must show injury done to them before they can ask to be relieved from contracts which they clamor to execute."

Upon the whole case, therefore, I am of opinion that the plaintiff is entitled to recover, and therefore that the verdict is right.

The defendant's motion for judgment notwithstanding the verdict is refused, and to this refusal an exception is sealed.